IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Brooklyn Lonker,**

       **Plaintiffs,**

**v.**                                                      Case No. 16-2097-JWL

**Darren Chambers,**
**in his individual capacity and**
**in his official capacity as Sumner County Sheriff,**

       **Defendants.**

## **MEMORANDUM & ORDER**

Plaintiff Brooklyn Lonker asserts claims against defendant Sheriff Darren Chambers under 42 U.S.C. § 1983, alleging that former Deputy Sheriff Jared Lyden violated her rights under the First and Fourth Amendments of the United States Constitution after she was detained and handcuffed in a patrol car following a traffic stop. Plaintiff asserts that defendant Sheriff Chambers, individually and in his official capacity as Sheriff, was deliberately indifferent to plaintiff in failing to properly train and supervise Deputy Lyden. This matter is presently before the court on defendant Darren Chambers' motion for summary judgment on plaintiff's claims (doc. 83). As will be explained, while the court has concerns about the conduct of Deputy Lyden and, more specifically, the manner in which he carried out his role in this traffic stop, the court finds that plaintiff has failed to present evidence from which a reasonable jury could find Sheriff Chambers liable for any constitutional violations which plaintiff contends occurred. The motion, then, is granted.

## I. Facts

The following facts are uncontroverted or related in the light most favorable to plaintiff as the nonmoving party.[1] Deputy Sheriff Jared Lyden began his employment with the Sumner County Sheriff's Department in January 2012. Because he was already a certified law enforcement officer at that time, he was assigned to a field training officer, Sergeant Campbell, in the Sheriff's Department. That training concluded on March 11, 2012. At that time, Sheriff Chambers recommended that Deputy Lyden obtain mental health counseling based on concerns that Deputy Lyden "was very aggressive on the job, making unnecessary arrests, [and] stopping . . . residents and writing tickets that put him at odds with agency protocols, procedures and culture within the department." Deputy Lyden's first mental health consultation was held on March 14, 2012. That meeting lasted roughly 30 minutes and the counselor, after the meeting, made certain "initial" recommendations to the Sheriff's Department. The initial recommendations included having Deputy Lyden complete 3 to 5 days of additional field training with a "seasoned" deputy in the department and scheduling a follow-up session with the counselor. Consistent with those recommendations, Deputy Lyden was assigned to Sergeant Wylie, a field training officer. Sergeant Wylie completed field training reports for March 15, 2012; March 16, 2012; and March 17, 2012. Plaintiff does not dispute that Sergeant Wylie's training was received well by Deputy Lyden and that Sergeant Wylie perceived that Deputy Lyden was improving with his guidance. A follow-up session was scheduled and held on March

---

[1] Although the factual detail set forth in this section exceeds what is necessary to resolve the pending motion, the court believes it helpful to describe fully the circumstances concerning the traffic stop.

26, 2012. That meeting lasted approximately 10 minutes. The consultation report identified the following final recommendations:

> 1. Jared will likely need continued mentoring, and should be monitored to gauge progress.
>
> 2. If this arrangement is not possible or practical, then re-assignment to a more controlled supervised position might be considered if one exists.

Sheriff Chambers testified that he did not do anything "specifically" to follow up on that recommendation and that he did not provide any "additional" mentoring or monitoring to Deputy Lyden beyond what is normally provided to deputies over the course of their employment. In that regard, the evidence demonstrates that the Sheriff's Office provided routine training and supervision to all deputies through the review of written reports submitted by each deputy and through regular monitoring by supervisors.

The record contains no evidence of any specific incidents of Deputy Lyden making unnecessary or over-zealous arrests or detentions until January 2014. At that time, Deputy Lyden testified in a suppression hearing before a Sumner County District Judge. According to plaintiff, Deputy Lyden testified at that hearing about a DUI traffic stop that he had conducted and the district judge, after viewing the dash cam recording, found that Deputy Lyden's description of events did not comport with the recording. Deputy Lyden testified in this case that, during the suppression hearing, the district judge determined that Deputy Lyden lacked probable cause to administer a field sobriety test.

The facts giving rise to this case occurred the following month, in February 2014. Officer Jeff Cole of the Conway Springs, Kansas police department was patrolling just north of the city limits around 12:30am on February 16, 2014. A vehicle passed Officer Cole's patrol car

3

and the driver of the vehicle failed to dim the vehicle's high-beam headlights. Officer Cole confirmed through radar that the vehicle was traveling 37 miles per hour in a 30-mile-per-hour zone. Officer Cole turned his patrol car around and stopped the vehicle because the driver was speeding and failed to dim the high-beam headlights.[2] In addition to the driver, later identified as Haley Rau, two passengers were in the vehicle. One passenger, Kylie Boswell, was riding in the front passenger seat and the other passenger, plaintiff Brooklyn Lonker, was riding in the rear of the vehicle. All three occupants of the vehicle were female high-school students returning from a bonfire party that they had attended together just south of Conway Springs. All three occupants of the vehicle were minors under the age of 21.

As Officer Cole approached the vehicle, Ms. Rau rolled her window down. Officer Cole testified that he immediately smelled a strong odor of alcohol coming from inside the vehicle. Plaintiff testified that it was "surprising" to her that Officer Cole could smell alcohol because she had only had one drink, she did not believe that Ms. Boswell had consumed more than that, and she believed that the smell of the bonfire would be "overwhelming" because they had sat by it for nearly 45 minutes.[3] Ms. Boswell testified that she was "sure" that she smelled "like bonfire." Officer Cole asked Ms. Rau for her driver's license and advised her that she was traveling over the speed limit and had left her high-beam lights on. Ms. Rau told Officer Cole that she did not have her license but she provided her name and birthdate, which revealed she was 16 years of age. Officer Cole confirmed with dispatch that Ms. Rau had a valid driver's

---

[2] The legality of the initial traffic stop is not challenged.
[3] Plaintiff cites to additional deposition testimony (Lonker depo. at 163-164) to support her allegations concerning the bonfire smell, but that excerpt was not included in the record and the court cannot consider it.

license and had no warrants. He testified that he then asked for identification from the two passengers because they were minors and there was an odor of alcohol. Ms. Boswell did not have her license but identified herself by name and birthdate, which revealed that she was 17 years of age. Similarly, plaintiff identified herself by name and birthdate, which revealed that she was 18 years of age.

Officer Cole advised the occupants of the car that he could smell alcohol and he asked whether anyone had consumed alcohol that evening. Ms. Rau advised him that she had consumed "one or two sips" of alcohol before the girls had left her house for the bonfire party. Officer Cole asked Ms. Rau to exit the vehicle to perform a field sobriety test. She then consented to a preliminary breath test (PBT). Because the Conway Springs police department did not have PBT equipment, Officer Cole advised Ms. Rau that he was going "to radio and ask for one." Officer Cole then asked for assistance from the Sumner County Sheriff's Office. While the record is not entirely clear, it appears that Deputy Lyden was the closest on-duty deputy with a PBT meter. The Computer Aided Dispatch (CAD) log shows that Deputy Lyden was contacted at 12:50am. At that time, he was working on the opposite side of the county—approximately a 45-minute drive from Officer Cole's location. It is undisputed that Deputy Lyden arrived at Officer Cole's location at 1:37am, as evidenced by the CAD log.

When Deputy Lyden arrived at the scene, he did not activate his emergency lights. Deputy Lyden knew that if he did not activate his emergency lights, his dash camera could not save the recording of the stop. Plaintiff suggests that Deputy Lyden's conduct in this regard was intentional because, just one month prior, a Sumner County district judge had concluded in the context of a suppression hearing that Deputy Lyden's testimony contradicted what was shown

on the dash cam recording. When Deputy Lyden arrived on the scene,[4] Officer Cole advised him that the driver had admitted to drinking and that Officer Cole smelled alcohol coming from inside the vehicle. Deputy Lyden heard Ms. Rau tell Officer Cole, in response to a question from Officer Cole, that all three of the occupants had been at a party and that all three of the occupants had been drinking alcohol that evening.[5] Deputy Lyden then administered the PBT to Ms. Rau which yielded a result of .000. At that point, Officer Cole asked Deputy Lyden to speak to the passengers because, according to his testimony, he could smell alcohol coming from both plaintiff and Ms. Boswell. Officer Cole testified that Deputy Lyden told him that he, too, could smell alcohol coming from both plaintiff and Ms. Boswell.

After administering the PBT to Ms. Rau, Deputy Lyden approached the front passenger window and addressed both plaintiff and Ms. Boswell. He advised them that he could smell the odor of alcohol. When Deputy Lyden began directing questions to Ms. Boswell, plaintiff spoke up and said, "We're not going to answer questions." Deputy Lyden warned plaintiff that he would arrest her for interfering with an investigation. After repeated attempts to elicit information (or an admission) from plaintiff and Ms. Boswell about whether they had been consuming alcohol, Deputy Lyden instructed plaintiff and Ms. Boswell to exit the vehicle. They complied and stood at the rear of the vehicle. Deputy Lyden testified that he could smell alcohol

---

[4] The record reflects that Deputy Lyden was accompanied by a civilian "ride along" who remained in Deputy Lyden's patrol car at all times.

[5] Plaintiff does not controvert that Ms. Rau advised Officer Cole that all three occupants of the vehicle had been drinking that evening but she objects to Deputy Lyden's testimony on hearsay grounds. The objection is overruled. Ms. Rau's statement is not offered to prove that the occupants had in fact been drinking alcohol that night but for the purpose of explaining the information available to Deputy Lyden at the time he decided to detain plaintiff. *United States v. Ibarra-Diaz*, 805 F.3d 908, 925 (10th Cir. 2015) (statement made to officer offered to explain the officer's conduct did not constitute hearsay).

when plaintiff and Ms. Boswell were standing side by side and, knowing that they were under the age of 21, believed that they had been unlawfully drinking. When plaintiff and Ms. Boswell were standing outside the vehicle, plaintiff continued to refuse to answer Deputy Lyden's questions about whether and how much alcohol she had consumed and continued to advise Ms. Boswell not to answer any questions. Both plaintiff and Ms. Boswell refused to submit to a PBT when Deputy Lyden asked for their consent to administer a PBT. Ultimately, Deputy Lyden placed handcuffs on plaintiff and put her in the back of his patrol car. Defendant asserts that plaintiff was placed in handcuffs in the patrol car because plaintiff continued to interrupt Deputy Lyden's efforts to communicate with Ms. Boswell and that she was impeding his investigation. Plaintiff asserts that she never interrupted Deputy Lyden and only told him that they were not required to answer any questions; that they would not answer questions without an attorney present; and that they were not required to submit to a PBT. In any event, plaintiff does not dispute that she was handcuffed and placed in the patrol car no later than 1:56am—less than 20 minutes after Deputy Lyden arrived on the scene. Plaintiff testified that Deputy Lyden, after plaintiff was placed in the patrol car, "yelled" at plaintiff and said to her, "You just need to admit to it, or I'm going to take you in" and that if he took her to jail that she "didn't even want to know what those people would do to" her. When Ms. Boswell again refused to consent to the PBT, she was placed in Officer Cole's vehicle to keep the minors separated and out of the cold weather.

Officer Cole contacted Marla Loehr, Ms. Boswell's mother, because she was the registered owner of the vehicle that Ms. Rau had been driving. The officers advised Ms. Loehr that they could smell alcohol on Ms. Boswell and plaintiff and that, because Ms. Boswell was

7

underage, their practice was to ask a parent to come and pick them up. At 2:00am, Ms. Loehr contacted her sister to come and pick her up so that they could then travel to the scene.[6] Ms. Loehr arrived at the scene at 2:45am. Ms. Loehr consented to a search of the vehicle. The officers seized three open containers from the vehicle—a can of Natural Light beer that still had beer in it; a bottle with a Bacardi label on it; and a clear tumbler that contained alcohol. Knowing that her mother was going to require her to take the PBT anyway, Ms. Boswell asserted that the alcohol belonged to her. Ms. Loehr told her daughter to consent to the PBT, which yielded a result of .04. Ms. Boswell then left the scene with her aunt in her aunt's vehicle and Ms. Rau drove Ms. Loehr and plaintiff home in the vehicle that Ms. Rau had been driving that evening. The stop was concluded at approximately 3:00am.

Deputy Lyden failed to write and submit a report following the traffic stop and ultimately served a two-day suspension for that failure. In September 2014, the Sheriff's Office served Deputy Lyden with a Notification of Internal Investigation relating to his conduct during vehicle stops. Deputy Lyden tendered his resignation immediately after being served with the notice.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II. Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the

---

[6] Ms. Loehr had consumed alcohol that evening and could not operate her vehicle because it was equipped with an ignition interlock device.

moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143-44.

## III. Discussion

In the pretrial order, plaintiff asserts that Sheriff Chambers' failure to train and supervise Deputy Lyden resulted in the constitutional deprivations she suffered and that Sheriff Chambers' failures reflect deliberate indifference to plaintiff's constitutional rights. Plaintiff's failure-to-train claim is asserted against Sheriff Chambers in both his official and individual capacities. Defendant Chambers first moves for summary judgment on the grounds that plaintiff's claims against Sheriff Chambers are necessarily premised on an underlying constitutional violation and no such violations occurred in this case. *See Gray v. University of Colo. Hosp. Authority*, 672 F.3d 909, 918 n.7 (10th Cir. 2012). Defendant Chambers also moves for summary judgment on the grounds that, even assuming that factual disputes exist concerning whether Deputy Lyden violated plaintiff's constitutional rights, there is no evidence from which a jury could reasonably conclude that any violation was caused by any alleged deliberate indifference of Sheriff Chambers with respect to the training or supervision of Deputy Lyden. *See City of Canton v.*

9

*Harris,* 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."). As will be explained, because the undisputed facts are clearly insufficient to permit a jury to find deliberate indifference on the part of Sheriff Chambers, the court grants summary judgment in favor of Sheriff Chambers on plaintiff's claims.[7]

*A. Standards for Supervisory Liability and Municipal Liability in Failure-to-Train Context*

Suing individual defendants in their official capacities under § 1983 is essentially another way of pleading an action against the county or municipality they represent. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (citing *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 690 n.55 (1978); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). "[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for municipal liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). However, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id*. at 388. Liability arises where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.

---

[7] For this reason, the court declines to address whether Deputy Lyden violated plaintiff's First and Fourth Amendment rights in connection with his detention and arrest of plaintiff.

Plaintiff's claim against Sheriff Chambers in his individual capacity is also grounded in the Sheriff's alleged failure to properly train and supervise Deputy Lyden. Accordingly, this claim amounts to a claim of supervisory liability. *See Cox v. Glanz*, 800 F.3d 1231, 1239 (10th Cir. 2015). It is unclear whether the "failure to train and supervise" theory of supervisory liability under § 1983 has survived the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) ("We have since recognized that *Iqbal* may have changed the § 1983 supervisory liability landscape, but we have not yet had occasion to determine what allegations of personal involvement . . . meet *Iqbal*'s stricter liability standard."). The court need not address that question here because plaintiff's claim fails to satisfy the Tenth Circuit's pre-*Iqbal* standards. Under that standard, plaintiff, as with her municipal liability claim, must establish that Sheriff Chambers acted with deliberate indifference. *See Dodds v. Richardson*, 614 F.3d 1185, 1196 n.4 (10th Cir. 2010) ("After *Canton*, 'deliberate indifference or reckless disregard' became the primary governing standard for supervisory liability."); *Vasquez v. Davis*, 2016 WL 6997261, at *2 (D. Colo. Nov. 30, 2016) ("[T]he Tenth Circuit has all but held that the law of supervisory liability for failure to train or intervene is functionally interchangeable with the law of *Monell* liability for similar failures.").

The deliberate indifference standard may be satisfied when the supervisor or municipality "has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. While notice in most instances is established by proving a pattern of tortious conduct, "[i]n a narrow range of circumstances, . . . deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a

11

highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id*. Plaintiff does not contend that the violations here were a highly predictable or plainly obvious consequence of Sheriff Chambers' action or inaction. Rather, she contends that Deputy Lyden engaged in a pattern of tortious conduct sufficient to put Sheriff Chambers on notice of the substantial likelihood that constitutional violations would occur. To prove the existence of a pattern of tortious conduct, plaintiff must show a pattern of "similar violations" and not simply an isolated instance. *See id*.; *City of Canton*, 489 U.S. at 390-91 (explaining that an isolated instance of failure to train a particular officer is not sufficient to infer a policy of failing to train officers); *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

## B. First Amendment

Aside from the allegations in this case, there is no evidence of any other incident in which Deputy Lyden allegedly arrested an individual in retaliation for statements made during a traffic stop or otherwise violated a citizen's First Amendment rights. According to plaintiff, Deputy Lyden testified to his belief that he could "arrest citizens for refusing to answer his questions and violate citizens' Constitutional rights as long as he thought they were 'guilty.'" This is a mischaracterization of Deputy Lyden's testimony. But even assuming that plaintiff had fairly characterized the testimony, it does not establish liability on the part of Sheriff Chambers in his individual or official capacity. While it arguably bears on the First Amendment issue implicated in this case, it does not permit an inference that Deputy Lyden, in fact, ever arrested anyone based solely on a refusal to answer his questions or based solely on statements made during a traffic stop. In the absence of any evidence of any prior incidents involving retaliatory

arrests made by Deputy Lyden (or, for that matter, any incidents involving First Amendment violations by Deputy Lyden), plaintiff cannot establish a "pattern" of tortious conduct which would have notified Sheriff Chambers that the Sheriff Department's training program was deficient or that a substantial likelihood existed that Deputy Lyden would inflict the constitutional injury alleged by plaintiff. *See Coffey v. McKinley County*, 504 Fed. Appx. 715, 719 (10th Cir. 2012) ("One prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.").

*C. Fourth Amendment*

In an effort to prove the existence of a pattern of Fourth Amendment violations on the part of Deputy Lyden sufficient to notify Sheriff Chambers of a problem, plaintiff relies on evidence concerning the mental health counseling that Deputy Lyden received at Sheriff Chambers' request in March 2012 and the January 2014 suppression hearing in which the state court judge determined that Deputy Lyden lacked probable cause for a DUI arrest. Viewed in the light most favorable to plaintiff, this evidence is insufficient to establish a pattern of conduct sufficient to provide the requisite notice to Sheriff Chambers. The evidence concerning the March 2012 mental health counseling is not evidence of Sheriff Chambers' deliberate indifference to a known risk of tortious conduct. To begin, the fact that Sheriff Chambers took the initiative to send Deputy Lyden for mental health counseling immediately upon the conclusion of Deputy Lyden's formal field training cuts against any suggestion that Sheriff Chambers disregarded any known risk of harm. Moreover, Sheriff Chambers, rather than failing to train or supervise Deputy Lyden, implemented the initial recommendations of the counselor

13

by assigning Deputy Lyden to additional days of field training with a seasoned sergeant in the department. While Sheriff Chambers did not do anything in particular with respect to the final recommendations, the evidence reflects that Deputy Lyden continued to receive the routine monitoring that all deputies received in the department. While plaintiff contends that Sheriff Chambers "ignored" the counselor's final recommendations, it is not enough to show that there were "general deficiencies in the county's training program" for Deputy Lyden. *See Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, plaintiff must identify a specific deficiency that was obvious and closely related to her injury. *Id.* Plaintiff identifies no specific deficiency in the training of Deputy Lyden and none is evident from the record, particularly as there is no evidence of any unnecessary (or, more to the point, unconstitutional) arrests that prompted the consultation. In other words, there is no evidence in the record of any specific incidents involving Deputy Lyden as of March 26, 2012 (the date of the counselor's final recommendations) that would have provided notice to Sheriff Chambers that additional mentoring or monitoring (above and beyond what the department provided in the ordinary course) was required. For this reason, plaintiff's allegation that Sheriff Chambers should have provided "continued mentoring" and monitoring does not satisfy her burden of showing that Sheriff Chambers acted with deliberate indifference to her rights.

Plaintiff also highlights the January 2014 suppression hearing before a Sumner County District Judge. The court assumes that Sheriff Chambers had knowledge of the state court's determination that Deputy Lyden's arrest lacked probable cause.[8] Nonetheless, Sheriff

---

[8] That finding, of course, is not necessarily the same as whether Deputy Lyden violated the driver's constitutional rights. *See Johnson v. Pottawotomie Tribal Police Dep't*, 411 Fed. Appx.

14

Chambers' knowledge of one potential Fourth Amendment violation is not enough to establish knowledge of a "pattern" of tortious conduct sufficient to show deliberate indifference. *See Coffey v. McKinley Cnty.*, 504 Fed. Appx. 715, 719 (10th Cir. 2012) ("One prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.").

*D. Remaining Evidence of Sheriff Chambers' Purported Knowledge*

In support of her argument that Sheriff Chambers had knowledge of a pattern of "ongoing constitutional violations" by Deputy Lyden, plaintiff identifies several facts that have no bearing on that issue, including that the environment at the Sheriff's Office was "chaotic" and that supervision was "poor"; that a supervisor had trained Deputy Lyden to destroy evidence; that supervisors and co-workers in the Sheriff's Office spent on-duty time making offensive comments on Deputy Lyden's Facebook page; that a convicted felon and registered sex offender (whose criminal history was undisputedly unknown to Sheriff Chambers or Deputy Lyden) was permitted to go on civilian ride-alongs with Deputy Lyden; that Sheriff Chambers stated that he wished he had ten more deputies "just like" Deputy Lyden; and that Sheriff Chambers instructed a subordinate to report to KS-CPOST that Deputy Lyden had resigned under ordinary circumstances. None of these facts, even if true, permit an inference that Deputy Lyden had

---

195, 200 (10th Cir, 2011) ("State law determinations do not control whether probable cause for an arrest exists under the Fourth Amendment.") (citing *United States v. Turner*, 553 F.3d 1337, 1346 (10th Cir. 2009) ("[I]f officers have probable cause to believe that a crime has been committed in their presence, they may arrest and search incident to that arrest without violating the Fourth Amendment, even if such police action is not authorized by state law.") (citing *Virginia v. Moore*, 553 U.S. 164, 178 (2008))).

15

engaged in a pattern of violating anyone's constitutional rights (let alone the specific rights at issue in this case) or, more importantly, that Sheriff Chambers had knowledge of any such violations.

Plaintiff also contends that Deputy Lyden had a "reputation for dishonesty" in the legal community based solely on an April 2015 journal entry dismissing the charges in the underlying case against plaintiff. In that journal entry, a Sumner County District Judge notes, as an alternative basis for dismissing the charges, that the arresting officer "has a reputation in the legal community for dishonesty" and "allowed important and possibly exculpatory evidence in his possession to be destroyed."[9] To the extent that plaintiff is attempting to prove that Deputy Lyden is dishonest, the evidence is clearly inadmissible hearsay. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("Under our precedents, we are constrained to disregard . . . hearsay on summary judgment when, as here, there is a proper objection to its use and the proponent of the testimony can direct us to no applicable exception to the hearsay rule."); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Moreover, the evidence is merely a red herring because Deputy Lyden's credibility is, at most, a peripheral issue in this case. It was Officer Cole—whose credibility is not attacked—who conducted the initial traffic stop in this case and who consistently testified that he smelled alcohol coming from the vehicle and from plaintiff.

---

[9] It is not clear what evidence Deputy Lyden allegedly allowed to be destroyed. The court presumes that the district judge was referencing Deputy Lyden's failure to activate his emergency lights (and, thus, his dash cam) when he arrived on the scene.

Lastly, plaintiff points to evidence that Sheriff Chambers, in September 2014, initiated an internal investigation into Deputy Lyden's conduct during vehicle stops. The notification concerning the investigation references "strong indications" that Deputy Lyden "violated the rights of citizens" during traffic stops and specifically references possible violations of the Fourth, Eighth and Fourteenth Amendments and Deputy Lyden's use of "coercion to obtain consent to search" and his detention of parties "beyond what is reasonable." For two reasons, this evidence does not establish deliberate indifference on the part of Sheriff Chambers. First, the evidence does not reflect knowledge of any constitutional violations similar to the violation alleged here. Second, the Supreme Court has held that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide "notice to the [municipality] and the opportunity to conform to constitutional dictates." *Id*. at 63 n.7. Moreover, there is simply no evidence of any "possible violations of the Fourth, Eighth and Fourteenth Amendments" arising from any incident other than the stop that is the subject of this case. Indeed, Sheriff Chambers testified that the sole reason for the investigation was "pressure" from plaintiff's counsel in this case "as to how Mr. Lyden conducts himself." He testified that the purpose of the investigation was to ensure that, contrary to plaintiff's allegations, a course of misconduct on the part of Deputy Lyden had not been occurring prior to the stop in this case.

In sum, plaintiff has not shown a pattern of tortious conduct that would have put Sheriff Chambers on notice that the training and supervision of Deputy Lyden was inadequate and that a substantial likelihood existed that constitutional violations would occur. Plaintiff, then, has failed to demonstrate a triable case against Sheriff Chambers for supervisory or municipal liability under § 1983.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Darren Chambers' motion for summary judgment on plaintiff's claims (doc. 83) is granted.

**IT IS SO ORDERED.**

Dated this 4th day of May, 2017, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge
